UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ARMANDO GOMEZ,
   a/k/a "El Doctor," and
FABIO SIMON YOUNES ARBOLEDA,

                         Defendants.

18 Cr. 262 (VEC)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney Southern
District of New York
*Attorney for the United States
of America*

Jason A. Richman
Benjamin Woodside Schrier
Kyle A. Wirshba
     Assistant United States Attorneys
     *Of Counsel*

## **<u>TABLE OF CONTENTS</u>**

BACKGROUND ............................................................................................................................. 3

PROCEDURAL HISTORY .......................................................................................................... 14

DISCUSSION ............................................................................................................................... 15

   I. The CS Recordings Are Audible and Authentic ................................................................. 15

      A. Applicable Law ......................................................................................................... 15

      B. Discussion ................................................................................................................. 17

   II. Severance Is Not Warranted in this Case ......................................................................... 19

      A. Applicable Law ......................................................................................................... 19

      B. Discussion ................................................................................................................. 21

   III. The Defendants' Requests for Early Production of Jencks Act Material and Rule 404(b) Notice Are Moot ..................................................................................................................... 23

   CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Richardson v. Marsh*, 481 U.S. 200 (1987) ........................................................ 20, 21

*United States v. Al-Marri*, 230 F. 535 (S.D.N.Y. 2002) .................................... 24

*United States v. Arango-Correa*, 851 F.2d 54 (2d Cir.1988) ................................ 17, 18

*United States v. Bryant*, 480 F.2d 785 (2d Cir.1973) ............................................ 17, 18

*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991) ...................................... 21

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ............................................. 23

*United States* v. *Davis*, 2009 WL 637164 (S.D.N.Y. 2009) .................................. 24

*United States* v. *Davis*, 57 F. Supp. 3d 363 (S.D.N.Y. 2014) ............................... 24

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ........................................... 16, 17

*United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003) ............................................ 20

*United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977) ........................................... 17

*United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007) ....................................... 16

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ............................................. 16

*United States v. Hameedi*, 2017 WL 5152991 (S.D.N.Y. 2017) ............................ 21

*United States v. Helbrans*, 2021 WL 2873800 (S.D.N.Y 2021) ............................. 24

*United States v. Hon*, 904 F.2d 803 (2d Cir. 1990) ............................................... 16

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ............................................ 16

*United States v. Lopez*, 2019 WL 4733603 (S.D.N.Y. 2019) .................................. 20, 21

*United States v. Maduro Moros, et al.*, S2 11 Cr. 205 (AKH) ................................ 5

*United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) ......................................... 16

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................................ 23

*United States v. Pedro Antonio Marin, et al.*, 04 Cr. 446 (TFH) ............................ 5

*United States v. Pirro*, 76 F. Supp. 2d 478 (S.D.N.Y. 1999) ................................. 20

*United States v. Pluta*, 176 F.3d 43 (2d Cir. 1999) ............................................... 16, 17

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ........................................... 20

*United States v. Santana*, 2015 WL 5781413 (S.D.N.Y. 2015) .............................. 22

*United States v. Sovie*, 122 F.3d 122 (2d Cir. 1997) .............................................. 18

ii

*United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) .................................................. 21

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004).......................................... 16

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) .................................................. 22

*United States v. Tropeano*, 252 F.3d 653 (2d Cir. 2001)............................................ 16

*United States* v. *Viera*, 2015 WL 17848 (S.D.N.Y. 2015) ........................................ 23

*Zafiro v. United States*, 506 U.S. 534 (1993)........................................................ 19, 20

**Rules**

Federal Rule of Criminal Procedure 14 ...................................................................... 19

Federal Rule of Evidence 404................................................................... 1, 3, 23, 24

Federal Rule of Evidence 801.................................................................................. 22

Federal Rule of Evidence 901......................................................................... 15, 16, 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | 18 Cr. 262 (VEC) |
| ARMANDO GOMEZ,<br>    a/k/a "El Doctor," and<br>FABIO SIMON YOUNES ARBOLEDA, | |
| Defendants. | |

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by Armando Gomez, a/k/a "El Doctor" ("Gomes") and Fabio Simon Younes Arboleda ("Younes Arboleda"): (i) a motion to exclude recordings made during the course of this investigation because they are allegedly inaudible and for the Government to provide further information regarding these recordings so the defendants can assess their authenticity; (ii) a motion by Younes Arboleda seeking severance from Gomez because Younes Arboleda alleges that he will suffer from spillover prejudice owing to the volume of evidence against Gomez if they have a joint trial; and (iii) a motion seeking early production of Jencks Act material and evidence the Government will seek to introduce pursuant to Federal Rule of Evidence 404(b).

The defendants' motions are without merit and should be denied.  Regarding the first motion, despite having received hundreds of pages of verbatim transcripts of some recordings and summaries of others, the defendants still claim that these recordings are broadly "inaudible" without specifying which portions are at issue or which they believe should not be admissible at trial.  Indeed, the defendants only purported attempt to identify any recordings at issue is to argue that the recordings of *all* in-person meetings are inaudible.  Similarly, the defendants broadly argue

1

that there are "authenticity" concerns with the recordings and that this provides a basis for the Court to order the Government to identify how many times the recordings have been copied and how they were kept in custody and transported to the United States. The defendants fail to acknowledge, however, that (i) the Government has produced to the defendants reports prepared by the Drug Enforcement Administration (the "DEA") concerning the creation and custody of these recordings; (ii) the defendants have had the recordings for well over a year (and, for Gomez, close to two years), during which time they could have hired an expert to examine them as they informed the Court they were planning to do; and (iii) the defendants have provided no actual basis to believe there are issues with the authenticity of the recordings other than unsupported innuendo. This motion should be denied.

The second motion is a request by Younes Arboleda to have his trial severed from Gomez owing to the alleged disparity in evidence against the defendants. Younes Arboleda falls far short of showing why he would be prejudiced by a joint trial and fails to identify even a single piece of evidence that would be admissible against Gomez and not against him. Instead, Younes Arboleda makes the conclusory assertion that he was not involved in any cocaine transactions and, presumably because he is contending that Gomez was so involved, he is entitled to a separate trial. This argument is undermined by long-standing Second Circuit law and belied by the facts in this case, which prove that Gomez and Younes Arboleda were co-conspirators and that the two participated, together, in the essential meetings during this conspiracy. As such, the Court should reject this motion, as well.

Finally, the defendants seek early disclosure of Jencks Act material and early Rule 404(b) notice. The Government has produced a large quantity of Rule 16 discovery in this case, including

2

hundreds of pages of draft transcripts and translations.  In addition, the Government has produced dozens of DEA reports, some of which constitute early production of Jencks Act material. Nonetheless, the Government will commit to producing any remaining Jencks Act material two weeks in advance of trial to avoid any potential concerns regarding trial preparation and will, consistent with practice in this District, provide Rule 404(b) notice, if any, when it files its motions *in limine*.  As such, these defense motions are moot, and the Court should deny them.

## **BACKGROUND**

Over several months in 2017 and early 2018, the defendants conspired and attempted to send thousands of kilograms of cocaine to the  United States.[1]  They were working with and representing some of the highest-ranking members of the *Fuerzas Armadas Revolucionares de Colombia*, or, translated into English, the Revolutionary Armed Forces of Colombia (the "FARC"), and they believed they were conspiring with high-ranking representatives of the Sinaloa Cartel, one of the most violent and prolific cocaine distribution organizations in the world.  Instead, they were negotiating with confidential sources (the "CSes") working at the direction of the DEA, who purported to represent the Sinaloa Cartel during the investigation.

As further detailed below, the proof at trial will include, among other things, recordings of meetings between the CSes and the defendants; recordings of calls between the CSes and the defendants; translations of electronic communications between the CSes and the defendants;

---

[1] In addition to Younes Arboleda and Gomez, the Government charged two other defendants in Indictment 18 Cr. 262 (VEC) (the "Indictment"), Seuxis Paucis Hernandez Solarte, a/k/a "Jesus Santrich" ("Santrich") and Marlon Marin ("Marin"). The Government later charged a fifth defendant, Vincent Schifano ("Schifano") by Complaint (the "Schifano Compl."), and Schifano later pled guilty to a Superseding Information, S5 18 Cr. 262 (VEC), charging him with one count of attempted money laundering in connection with the underlying narcotics importation conspiracy.

communications intercepted by Colombian law enforcement among the defendants discussing important events that occurred during their negotiations and their planned cocaine distribution partnership; testimony about and a recording of the delivery of payment for a 5-kilogram sample of cocaine during a meeting attended by the defendants; testimony about and a video-recording of the delivery of the 5-kilogram sample of cocaine by Gomez to one of the CSes; and cooperating witness testimony.

The first meeting took place in a hotel lobby in Bogota, Colombia, on June 20, 2017, and included Younes Arboleda, Gomez, Marin, and a DEA Confidential Source ("CS-1").[2]  At the outset of this meeting, when Marin wasn't present, the other participants began by discussing Younes Arboleda's connections to an individual in Lebanon named Mohammed Bazzi[3] and the defendants' relationships with high-ranking politicians in Venezuela.  The conversation then segued to the FARC, with Younes Arboleda stating that "the FARC are the … largest drug cartel" in the world.  Younes Arboleda then continued by explaining that the "biggest part of all the

---

[2] The details of the meetings and phone calls contained herein (which took place almost entirely in Spanish) are derived from both recordings of these events and DEA reports of the same based, in part, on additional information from the CSes.  Some of the meetings were captured by multiple recording devices, including both audio and/or video, except for the meeting on September 26, 2017, for which the recording has become corrupted.  All of the recordings in question and DEA reports have been produced to the defendants.  All of the quotations and summaries contained herein are drafts, subject to further review.

[3] On or about May 17, 2018, the United States Department of Treasury sanctioned Bazzi for his support of Hizballah.  Among other things, the announcement noted that Bazzi "is a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities."  *See*  United States Dep't of Treasury, "Treasury Targets Key Hizballah Financing Network and Iranian Conduit," May 17, 2018, *available at* https://home.treasury.gov/news/press-releases/sm0388.

merchandise," meaning cocaine, "in Venezuela belongs to [the FARC]."  Younes Arboleda further detailed that Ivan Marquez was his FARC point of contact and that Marquez "manages Europe, the Middle East, Asia, and Africa."[4]  Younes Arboleda then discussed his access to "merchandise" and to individuals who "have the merchandise" before Gomez eventually ended that part of the conversation by reminding the parties that they were in a public place and "[y]ou never know what could be happening."

Younes Arboleda then told CS-1 that he had cancelled a meeting with Marin that day, and that Marin was a close relative of Marquez. Younes Arboleda then said he was going to invite Marin to join them for the remainder of the meeting.  Younes Arboleda then brought Marin to the meeting and introduced him to CS-1, and the parties agreed to meet again soon.

The second in-person meeting took place on July 10, 2017.  Again, Younes Arboleda, Gomez, Marin, and CS-1 participated in this meeting and, this time, they were joined for part of the meeting by two individuals introduced as Marin's cousins, also FARC associates, who could help them obtain and transport cocaine.  At the outset, CS-1 confirmed with Marin that Marin's uncle was Marquez, and they began discussing the planned partnership.  Marin explained that they had to be careful because of the ongoing FARC peace process with the Colombian Government, and that he had two people "on their way over here that work with us, who have the departures right here from El Dorado. . . . and we're talking 1,000 and up," a reference to shipments of 1,000

---

[4] Luciano Marín Arango, a/k/a "Ivan Marquez" ("Marquez") is a Colombian citizen who joined the FARC in or about 1985.  Marquez was a member of the FARC's Secretariat, which is the FARC's highest leadership body, and is a fugitive on pending charges in both *United States v. Maduro Moros*, *et al.*, S2 11 Cr. 205 (AKH) and *United States v. Pedro Antonio Marin*, *et al.*, 04 Cr. 446 (TFH), an indictment filed by the United States Attorney's Office for the Southern District of New York charging 54 leaders of the FARC with cocaine-importation charges.

kilograms and more of cocaine from El Dorado International Airport in Bogota, Colombia.[5]  Marin then told CS-1 that he could get him "1,000" kilograms of cocaine if CS-1 requested them, offered to take CS-1 to a cocaine laboratory so CS-1 could see where it was made, and explained that he had access to cocaine both in paste and already cooked into "squares."

The parties continued their conversation, and Marin detailed that he had access to "best in the market" prices for cocaine and had contacts in Venezuela "with the *Soles*."[6]  After Gomez received a phone call, Younes Arboleda implored the parties to "continue with the negotiation." Gomez then discussed "2,000" and "3,000" "meters," coded references to thousands of kilograms of cocaine.  Younes Arboleda then noticed someone sitting at another table and suggested that the parties be more careful and "not talk so much" because he was worried that they were "going to call security" if they overheard them discussing cocaine.  Gomez and Younes Arboleda then both said that the men at the other table looked like police officers, and Younes Arboleda said he preferred "never to talk" during the negotiations, and that instead CS-1 and Marin should "solidify things" and "take advantage of this meeting" before the other FARC members Marin had invited to the meeting arrived.

--------------------------------------------------

[5] In or about 2016, the Colombian Government and the FARC entered into an agreement called, in English, the "Final Agreement to End the Armed Conflict and Build a Stable and Lasting Peace" (the "Peace Accords").  The Peace Accords had a number of provisions, including certain amnesty for FARC members who signed them and the creation of a special court to adjudicate claims arising from FARC-related offenses in the past.

[6] The *Cartél de los Soles* or, "Cartel of the Suns," is a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who facilitated the importation of tons of cocaine into the United States, in part through its partnership with the FARC.  *See United States v. Maduro Moros, et al.*, S2 11 Cr. 205 (AKH).

Marin, Younes Arboleda, and Gomez then detailed for CS-1 particulars about the FARC, and Marin showed CS-1 photographs of himself with members of the FARC leadership. Younes Arboleda explained that Marquez had significant power in the FARC, and Marin detailed how the FARC was structured and engaged in the peace process with the Colombian Government. The parties then discussed pricing per kilogram and quantities. Regarding quantities available, Marin said that "we can start with 1,000. We can do it with a smaller quantity so that you can see how the thing is done." The parties then discussed places to sell the cocaine, with Younes Arboleda noting that prices in the United Kingdom were "off the charts." The parties then discussed potential law enforcement attention that they needed to avoid, with Younes Arboleda noting that there were "11 agencies united" in the United States to fight against drug-trafficking.

The two FARC associates then arrived at the meeting, and Marin introduced them by saying that the idea was to initially work with "1,000 girls," meaning 1,000 kilograms of cocaine. One of the two associates asked if it was going to be "1,000 at once," and Younes Arboleda replied "yeah, at once," and Gomez confirmed "we'll see how the situation is and all that stuff." Younes Arboleda then confirmed with the FARC associates that they had the capability to produce that quantity, and they responded affirmatively. The parties then discussed potential destinations for the cocaine, with Marin explaining that people generally didn't like sending cocaine to the United States. In the days after the meeting, Marin messaged CS-1, and provided him with information on an airplane being used by the FARC, which had an N-tail number, meaning it was registered in the United States.

The parties continued their negotiations in early August. At one meeting with the defendants, CS-1 brought a second confidential source ("CS-2") with him, and they reiterated that

they represented the Sinaloa Cartel and further discussed their planned cocaine distribution partnership. CS-1 told them that they would transport the cocaine to Miami for testing and potential distribution in Miami or Canada. The parties then discussed obtaining a sample of "five" kilograms of cocaine for testing, and the pricing that the FARC would charge for the cocaine and storage. The day after the meeting, the defendants again met with CS-1 and CS-2 and brought with them a financier named Tiago. During the course of this meeting, Gomez, Younes Arboleda, and CS-2 discussed the particulars of the cocaine sample that the CSes had requested, and Gomez told CS-2 that the FARC was "going to do it to the specifications" and then provide them with the sample requested.

On August 8, Gomez called CS-1 and told CS-1 he was present with "Commander Santrich."[7] Santrich then got on the phone and told CS-1 that "inroads have been made towards favorable positive horizons." CS-1 replied that things were going well with "sobrino," a Spanish word meaning "nephew" and a reference to Marin, Marquez's nephew, and Santrich responded that "our doors are open to you."

As their plans solidified, the three defendants again met with CS-1 and CS-2 on September 25, 2017, and CS-1 and CS-2 paid the defendants 22,500,000 pesos (approximately $8,000) for the anticipated upcoming delivery of a 5-kilogram sample of cocaine. During this meeting, Marin

---

[7] Santrich is a Colombian citizen who joined the FARC in or about 1991. Santrich was a member of the FARC's Central High Command, which is the FARC's second-highest leadership body. Santrich was arrested in connection with the charges in the Indictment but was later released. Open-source reporting indicates that Santrich was killed in or about May 2021. *See, e.g.*, J. Turkewitz, "Colombia Rebel Commander 'Jesus Santrich' Killed, Venezuelan Officials Say," N.Y. Times (May 18, 2021), https://www.nytimes.com/2021/05/18/world/americas/jesus-santrich-killed-colombia.html.

told CS-1 and CS-2 that the "purest" cocaine was from Tumaco, and it was the "best stuff," that Marin had talked to the "boss over there" and that Marquez and Marin would request the sample and get it sent to Bogota for delivery to the CSes.  The CSes then said, again, that their partners in Miami were ready to receive the five-kilogram sample and they provided the defendants with payment for the sample.  During this meeting, Younes Arboleda told CS-1 that "Marlon . . . was the one who took me to his uncle," a reference to Marquez, and Younes Arboleda explained that he (Younes Arboleda) was there to "help consolidate the operation" and to help create "systems" about "who receives, who pays, who delivers, what the communication is like."  Specifically, Younes Arboleda explained that they needed to know how "many are going out, they'll pay you this much for them," and Younes Arboleda explained to the CSes Marin's concerns about the deal. Specifically, he told them that Marin felt he was taking the "first risky step" in the transaction, and asked the CSes whether "he delivers to you guys first, and then you guys pay him … or is it the other way around?"  CS-2 explained that they would pay first, and provide guarantees, and CS-1 explained that Marin "asked us for 50 percent of the value of the 2,000" kilograms.

Younes Arboleda then explained to the CSes the concerns on behalf of the FARC participants, and the risks they were taking in carrying on this deal.  He told the CSes that before taking them to meet with Santrich or Marquez, Marin had to confirm who they are, so that they could make sure they were not working for the "DEA" or "CIA."  Younes Arboleda said this could create an "international incident" if it happened and their negotiations were made public.[8]  Younes

---

[8] As part of the peace process, FARC members who signed the Peace Accords had to promise to, among other things, refrain from future narcotics trafficking.  Santrich and Marquez were both among the small group of FARC leadership involved in the negotiation of the Peace Accords.

Arboleda then further explained his own role, facilitating the deal with Marin.  Finally, Younes Arboleda told the CSes he could serve as the guarantee for the five kilograms of cocaine.   The defendants again met with CS-1 and CS-2 the following day, September 26, 2017.  During this meeting, Younes Arboleda brought a suspected money launder to the meeting to introduce him to the other participants.

After several more weeks of negotiations, Gomez then delivered the promised 5-kilogram sample on November 1, 2017, as depicted in the below screenshot of Gomez, on the left, carrying the bag, later photographed at right, containing approximately 5-kilograms of high-purity cocaine:

 

After Gomez delivered the 5-kilogram sample, Gomez and Younes Arboleda again met with the CSes later that day.  During the course of this meeting, the participants discussed the cocaine sample, and Gomez said the "operation with the five was done because it was a … practice run, and it was a matter of looking at the quality."  The parties then, again, had explicit discussion of the quantities they intended to distribute, with repeated reference to thousands of kilograms of cocaine.  Younes Arboleda confirmed that CS-1 was "correct" that the CSes would deliver the money to him, and then he would be the one who "gives the orders" about the drugs being paid

10

for and ready to transport.  During this meeting, CS-1 reminded the participants that the cocaine was destined for, among other places, "Miami and New York."  The defendants and the CSes discussed the particulars of their partnership at length, with CS-1 ending the meeting by telling the defendants he wanted "the blessing of Santrich" before he continued their negotiations.

Another meeting took place on November 2, 2017 between the CSes, Marin, and Santrich. During this meeting, Santrich provided the CSes with a signed sketch with an inscription reading, in Spanish, "For Don Rafa Caro[9] with all my best wishes and with the hope for peace," with Santrich's signature and the date:



During this meeting, Santrich assured the CSes that if anything went wrong with the business they were discussing, the FARC would accept responsibility.  Santrich added that, because of the peace process between the FARC and the Colombian Government, he could not himself be involved in

---

[9] Rafael Caro-Quintero is one of the founders of the Guadalajara Cartel, and is wanted in the United States for, among other things, his role in the 1985 murder of DEA Agent Enrique Camarena.

the negotiations.  Finally, CS-1 told Santrich that Caro-Quintero was hoping to travel to Colombia, and they discussed whether Santrich could provide him protection in the country.

Over the next several weeks, the CSes and defendants continued to plan their partnership and, specifically, started to focus on how they would move payment for the cocaine from the United States to Colombia.  To that end, Marin introduced Schifano to the CSes as someone who could launder money for the CSes.  Schifano then engaged in a series of meetings and recorded communications with CS-1 during which they discussed the particulars of their planned money laundering transactions.  Specifically, during a December 7, 2017 meeting in Miami, Florida, Schifano told CS-1 that Schifano "had these friends in Colombia for a long time who are telling me that there are some friends here in the United States" who needed help with cash and banked money they wanted to deliver to Colombia.  *See* Schifano Compl. ¶ 7(b)(i).  CS-1 then explained the particulars of the deal, including the sample buy, that the sample was sent to New York, and that the plan was to ultimately purchase "10,000 kilos" of cocaine.

On February 8, 2018, the CSes met with Marin and Santrich again at Santrich's home in Bogota, Colombia.  During this meeting, among other things, the CSes told Santrich that they had $15 million to deliver to the FARC, in $5 million installments.  CS-1 then told Santrich and Marin that "Vincent," a reference to Schifano, was a very serious person that they could work with.  CS-1 then provided Santrich with a dollar bill, with a particular serial number, so they could pass it to Schifano to act as a "token" authorizing the transaction.  CS-1 then discussed, in coded terms, the 5-kilogram sample, and told Santrich that they needed his blessing to go forward with the larger transaction.  Santrich told them it was okay.

The following day, CS-1 met with Schifano in Miami. *See* Schifano Compl. ¶ 7(c). During this meeting, Schifano provided CS-1 with the token they had passed to Santrich the prior day, and they again discussed the particulars of their planned transaction and CS-1 told Schifano that the money was wrapped in three $5 million bundles. *Id.* The next week, CS-1 and an undercover officer met with Schifano again and provided him with access to a car that had a large, open suitcase in the trunk containing $5 million in sham U.S. currency. *See id.* ¶ 7(d)(iv).

In addition to the recorded meetings discussed above, the defendants also engaged in recorded electronic communications with the CSes. For example, on or about August 9, 2017, Younes Arboleda exchanged WhatsApp messages with CS-1 during which Younes Arboleda, among other things, told CS-1 that his "friend will be with the accountant" and it was "important for the money of the 5 responsibilities," a coded reference to the 5-kilogram cocaine sample. Similarly, on or about August 27, 2017, CS-1 messaged Younes Arboleda about the "5 televisions," another reference to the same. The defendants also engaged in communications lawfully intercepted by the Colombian authorities.[10] During the course of these many calls, the defendants continued their negotiations and discussions about their cocaine distribution partnership. By way of example, the Colombian authorities intercepted a call, on or about August 8, 2017, during which Younes Arboleda and Marin engaged in a discussion about "five televisions," a coded reference to the 5-kilogram sample of cocaine later delivered by Gomez to CS-1. Similarly, on or about August 14, 2017, Younes Arboleda and Marin had an intercepted

---

[10] The Government has produced to the defendants the calls intercepted by Colombian authorities and underlying authorization paperwork. In addition, the Government has identified for the defendants the intercepted calls the Government believes most pertinent to this case (and the ones it may rely on at trial) and provided draft transcripts of many of the same.

conversation discussing payment for the "five televisions."  And on February 17, 2018, Younes Arboleda and CS-1 had a recorded call during which they discussed the seizure of the supposed $5 million from Schifano.

## PROCEDURAL HISTORY

On or about April 9, 2018, the defendants charged in the Indictment were all arrested in Colombia and Schifano was arrested in Florida.  Gomez arrived in this District on or about February 27, 2020 and was ordered detained.  (Dkt. 32).  Younes Arboleda arrived in this District on or about October 30, 2020.  On or about November 17, 2020, the Court denied Younes Arboleda's motion for bail pending trial.  (*See* Nov. 17, 2020 Dkt. Entry).[11]

The Court has since held a series of status conferences in this matter as the defendants have continued to ask for more time to review the discovery provided by the Government.  After a conference on August 17, 2021, the Court ordered the Government to identify for the defendants the most pertinent meetings and phone call recordings that were obtained during the investigation. (Dkt. 86).  The Court also ordered the Government to provide defense counsel with transcripts of the identified recordings.  (*Id.*).  On October 29, 2021, the Government filed an update letter with the Court informing the Court that the Government had provided the defendants with a list of the consensual source recordings in this matter, along with a list of participants and particularly important events, and had produced approximately 58 transcripts and 10 summaries.  (Dkt. 89). On December 3, 2021, the Government provided the Court with a subsequent update, and informed the Court that the Government had produced approximately 100 additional transcripts since the

---

[11] Schifano pled guilty, pursuant to a plea agreement and to a one count Information charging him with conspiracy to commit money laundering, on October 17, 2018.  (*See* Dkts. 16-17).  The Court sentenced Schifano to a term of 108 months' imprisonment on March 28, 2019.  (Dkt. 25).

last update.  (Dkt. 90).  Younes Arboleda then filed his pre-trial motions on January 14, 2022. (Dkts. 94, 95).  Gomez joined two of Younes Arboleda's motions (*i.e.*, the motions regarding the CS recordings and for early production of Jencks Act material and Rule 404(b) notice).  (Dkt. 96).

## DISCUSSION

### I.  The CS Recordings Are Audible and Authentic

The defendants make two broad and unsupported claims concerning recordings of the in-person meetings between the defendants and the CSes—first, that they should be excluded because they are inaudible and, second, that the Government should provide additional information about them so the defendants can contemplate potential authenticity motions. Regarding the first argument, the defendants claim that "the recordings made on body wires are inaudible, as are the ones made on recording devices surreptitiously placed in hotel lobbies and by restaurant tables." (Def. Mot. at 4).[12]  Regarding the second, the defendants "contest[ ] the authenticity of the recordings" and argue not that the Government "should be required to state, in advance of trial, each recording it seeks to introduce at trial, the complete chain of custody for each recording, how many times each recording was duplicated by Colombian law enforcement agents before arriving in the United States, and how many times it was duplicated by agents in the United States before it was produced to the defense."  (Def. Mot. at 4-5).

### A.  Applicable Law

To authenticate an item, the party offering it "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The bar for

_____

[12] "Def. Mot." refers to the memorandum of law filed in support of Younes Arboleda's pre-trial motions.  *See* Dkt. 95.

authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). Instead, "the standard for authentication is one of 'reasonable likelihood,' and is 'minimal.'" *Id.* (citations omitted). Consistent with this standard, "[t]he proponent of the evidence is not required to 'rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be.'" *United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)). To the contrary, Rule 901 is satisfied "'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* at 38 (quoting *Pluta*, 176 F.3d at 49). "If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (quotation marks and citation omitted); *see also, e.g.*, *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) ("Authentication of course merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury.").

Physical evidence may be authenticated by proving a "chain of custody." *See, e.g.*, *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995). It is well-established that a "break in the chain of custody does not necessarily result in the exclusion of the physical evidence," *United States v. Gelzer*, 50 F.3d at 1141. Any flaws in a chain of custody "'do not bear upon the admissibility of evidence, only the weight of the evidence.'" *United States v. Jackson*, 345 F.3d 59, 65 (2d Cir. 2003) (quoting *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998)); *United States v. Hon*, 904 F.2d 803, 810 (2d Cir. 1990) ("[A]lleged defects in the . . . chain of custody proof [are] for the jury to evaluate in its consideration of the weight to be given to the evidence.").

Regarding audibility, the fact that some portions of a recording may be inaudible is not a proper basis for exclusion under the authentication rule. "The authentication prerequisite simply requires the proponent to submit 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Pluta*, 176 F.3d at 49 (quoting Fed. R. Evid. 901(a)). So long as "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity," the authentication requirement is satisfied. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001). When a district court considers the admissibility of an arguably inaudible recording, the inquiry is typically one of relevance rather than authentication. In other words, the question is not whether there are "ambiguous" or "inaudible" portions in the recordings, but whether the audible portions of the recordings retain probative value. *United States v. Arango-Correa*, 851 F.2d 54, 58 (2d Cir.1988). "Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy[,] the recording is admissible." *United States v. Bryant*, 480 F.2d 785, 790 (2d Cir.1973); *see also United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977). "Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *Arango-Correa*, 851 F.2d at 58.

## B.  Discussion

The defendants fall far short of establishing that a hearing is warranted regarding the audibility or authenticity of the recordings of the in-person meetings in this case.  In the broadest possible strokes, the defendants allege that "[s]ome of the recordings are audible, but others are inaudible" and that "the recordings made on body wire are inaudible as are the ones made on recording devices surreptitiously placed in hotel lobbies and by restaurant tables." (Mem. of Law at 4).  The defendants make their argument about audibility despite the Government having

17

produced hundreds of pages of verbatim transcripts of these very meetings, in both Spanish and English, and summaries of the same.  To be sure, there are inaudible portions of some of these transcripts, just as there are with almost every recorded meeting in every investigation, but the defendant has not identified unintelligible portions of the recordings "so substantial as to render the recording as a whole untrustworthy."  *Arango-Correa*, 851 F.2d at 58 (quoting *Bryant*, 480 F.2d at 790).  Accordingly, the Court should deny this motion without a hearing.[13]

The defendant's second argument—that the Government "should be required to state, in advance of trial, each recording it seeks to introduce at trial, the complete chain of custody for each recording, how many times each recording was duplicated by Colombian law enforcement agents before arriving in the United States, and how many times it was duplicated by agents in the United States before it was produced to the defense"—is largely moot.  The Government has already made clear that it plans to introduce portions of "all of the meetings" that were recorded. (Dkt. 87 (transcript of Aug. 17, 2021 conference) at 8).  Moreover, the Government has already produced to the defendants all DEA reports on the recordings in question.  These include, among other things, information about the chain of custody of the evidence, and when and where the CSes and, later, the DEA, obtained the recordings.  In addition, the defense has the recordings themselves (*i.e.*, the recordings that were downloaded), and, as the defense informed the Court it

---

[13] To the extent the defendants do want to employ an expert witness to examine—and potentially testify—about the recordings, they are, of course, free to do so.  Any such testimony, however, would go to the weight and not admissibility of the recordings.  *United States v. Sovie*, 122 F.3d 122, 127-28 (2d Cir. 1997) ("In any event, the defense in the instant case was allowed to develop testimony related to the alleged tampering and to argue to the jury that the tapes may have been incomplete.  The jury, after hearing testimony and arguments relative to the reliability and accuracy of the tapes and under proper instructions from the court, reached its own conclusion on that issue.  Because the issue is one of weight rather than admissibility, the court properly left it to the jury.").

was contemplating at a prior conference, the defense is free to hire an expert witness to evaluate the recordings.  (*See* Dkt. 87 (transcript of Aug. 17, 2021 conference) at 7-8).    The defense has the information it requests and any arguments concerning the chain of custody or otherwise about the contents or authenticity of the recordings are arguments to be made to a jury at trial.  *See, e.g.*, *Morrison*, 153 F.3d at 57 ("Breaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence[.]").  For these reasons, the Court should deny the defendant's motion.

## II.   Severance Is Not Warranted in this Case

Next, Younes Arboleda moves for severance owing to the alleged disparity in evidence between him and Gomez.  (Def. Mot. at 4-6).  More specifically, he argues that "the voluminous evidence against Mr. Gomez is overwhelming" while the evidence against him is "*de minimis*."  (*Id.* at 4).  Younes Arboleda further argues that "[u]nlike Mr. Gomez, [he] did not participate in any narcotics transactions . . . was not involved in narcotics production or packaging . . . [and] did not possess cocaine, transport it by vehicle or airplane or import it to the United States."  (*Id.*).  Instead, he contends, the case against him is "premised on the Government's interpretation of [his] statements during meetings, as well as the comments that conspirators, such as Mr. Gomez, made in the presence of Mr. Younes."  (*Id.*).   For the following reasons, Younes Arboleda's argument is misplaced and his request for a severance should be denied.

### A.   Applicable Law

"There is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro v. United States*, 506 U.S. 534, 537 (1993). However, under Rule 14 of the Federal Rules of Criminal Procedure, "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant. . . ., the court may order separate trials of counts, sever

19

the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Severance is considered "an extreme remedy." *United States v. Lopez*, No. 18 Cr. 736, 2019 WL 4733603, at *4 (S.D.N.Y. Sept. 27, 2019). "The burden is on the defendant to demonstrate that severance is proper," *id.*, and this burden can be satisfied only with a showing that "a joint trial would subject him to 'legally cognizable prejudice,'" *United States v. Pirro*, 76 F. Supp. 2d 478, 481 (S.D.N.Y. 1999) (quoting *Zafiro*, 506 U.S. at 541).

The preference for joint trials reflects the idea that "[j]oint trials play a vital role in the criminal justice system" because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537 (quotation marks omitted); *see also Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (explaining that joint trials "enabl[e] [a] more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit"). The Supreme Court has, therefore, instructed that "a district court should grant a Rule 14 severance motion only when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *Zafiro*, 506 U.S. at 539). Even in situations "where the risk of prejudice is high," the court should consider "less drastic measures—such as limiting instructions—[which] often suffice as an alternative to granting a Rule 14 severance motion." *Id.* The preference for joint trials "is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also Pirro*, 76 F. Supp. 2d at 483.

### B. Discussion

Younes Arboleda fails to justify the "extreme remedy" he now seeks. *Lopez*, 2019 WL 4733603 at *4. The defendant premises his argument on the alleged disparity in evidence between him and Gomez. Even assuming this to be true—and Younes Arboleda offers no support for this assertion, as discussed below—this argument fails. As the Second Circuit has recognized, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance," particularly when the unrelated evidence does not "reflect[ ] activities of a violent nature." *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *see also United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) ("[E]ven the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." (internal quotation marks omitted)). Moreover, "[i]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role." *United States v. Hameedi*, No. 17 Cr. 137, 2017 WL 5152991, at *5 (S.D.N.Y. Nov. 3, 2017) (citation omitted) (alteration in original); *see also Richardson*, 481 U.S. at 210. Thus, even if Younes Arboleda were a "minor" participant in this conspiracy, and he was not, and even if there was significant evidence admissible against Gomez that would not otherwise be admissible against Younes Arboleda at trial alone, and there is not, severance would still not be an appropriate remedy under long established law within this Circuit.

Beyond that, Younes Arboleda fails to articulate what evidence would be admissible against Gomez and not against him—providing another basis to deny this motion for severance. To be sure, Gomez delivered the 5-kilogram cocaine sample to CS-1, not Younes Arboleda, and there were meetings and conversations that Gomez participated in that Younes Arboleda was not a party to (and vice versa). However, this 5-kilogram sample delivery, and any conversations

involving Gomez and not Younes Arboleda, were all part and parcel of the same conspiracy that Younes Arboleda participated in.  Indeed Gomez's delivery of a 5-kilogram sample of cocaine that Younes Arboleda helped negotiate is direct proof of the conspiracy and is admissible against Younes Arboleda as well, and Gomez's statements are admissible against Younes Arboleda as they were in furtherance of the charged conspiracy.  Fed. R. Evid. 801(d)(2)(E) (co-conspirator statements made during and in furtherance of a conspiracy, and offered against a defendant, are not hearsay); *see also United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (citations omitted).  The very sample delivered by Gomez was discussed by Younes Arboleda—not just in recorded meetings with the CSes, but also in intercepted communications with his co-conspirators.  And it was Younes Arboleda himself who first introduced Marin to CS-1 and told CS-1 the background to his relationship with Marin and Marin's relationship with the FARC (which supplied the cocaine).  Thus, the evidence against the two defendants overlaps, and any argument to the contrary falls flat.

Finally, Younes Arboleda requests a "general outline of the evidence [the government] seeks to introduce against each defendant."  (Def. Mot. at 5.)   First, no such outline is necessary for the Court to determine whether severance is appropriate, for the reasons stated above, and the defendants cite to no authority requiring the Government to provide such an outline.  To the contrary, caselaw indicates just the opposite—the defendants are not entitled to a roadmap of the Government's evidence at this stage of the proceedings. *Cf. United States v. Santana*, No. 13-CR-147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (noting, in context of a bill of particulars request, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied.")  (internal

quotation marks omitted).  Regardless, the Government has provided the defendants with an index

of the in-person meetings (portions of each of which it would seek to introduce) and a listing of

all recorded communications, including recorded CS communications and electronic messages,

and all of the most relevant communications intercepted by Colombian law enforcement (a list

culled down from thousands of Colombian intercepts).  In addition, the Government has identified

for the defendants the portions of certain recordings that the government considers most significant

and has produced in discovery to the defendants a search warrant affidavit that outlines much of

the same.  Similarly, the Government has had conversations with counsel for each defendant about

the contours of the Government's case and offered to engage in continued discussions in the future.

As such, this request for an outline of the Government's evidence should be denied.

### III.  The Defendants' Requests for Early Production of Jencks Act Material and Rule 404(b) Notice Are Moot

Finally, the defendants ask the Court to order the Government to provide Jencks Act

material and Rule 404(b) evidence "to the defense sufficiently in advance of trial to afford a

meaningful opportunity to examine and utilize this material."  (Def. Mot. at 6).  To address this

concern, the Government agrees to provide all Jencks Act material, assuming a Protective Order

is entered governing the dissemination of such material, two weeks before trial.  *See United States*

*v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is

insufficient to require its production in advance of trial."); *United States v. Coppa*, 267 F.3d 132,

146 (2d Cir. 2001); *see also United States v. Viera*, No. 14 Cr. 83, 2015 WL 171848, at *6

(S.D.N.Y. Jan. 14, 2015) (holding that production of *Giglio* material one week before trial and

Jencks Act material for all witnesses on the Friday before trial "comports with the defendants' due

process rights" (collecting cases)); *United States v. Davis*, 57 F. Supp. 3d 363, 369 (S.D.N.Y.

2014) (approving production of *Giglio* material, including with respect to a confidential informant and cooperating witness by "reveal[ing] their identities," one week before trial); *United States v. Davis*, No. 06 Cr. 911, 2009 WL 637164, at \*14 (S.D.N.Y. Mar. 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis in the law.").

Regarding any evidence the Government may seek to introduce pursuant to Rule 404(b), the Government will, consistent with standard practice in this District, provide Rule 404(b) notice in connection with the filing of its motions *in limine*. *See, e.g.*, *United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 2873800, at \*20-21 (S.D.N.Y. July 8, 2021) (collecting cases on the general practice in this District concerning Rule 404(b) notice and denying as moot and premature a request made before a trial date was set); *see also United States v. Al-Marri*, 230 F. 535, 542 (S.D.N.Y. 2002) (adopting 404(b) notice deadline two weeks prior to trial where defendant "has not provided sufficient grounds to justify why an earlier production date is necessary"). This, too, will provide the defendants with adequate opportunity to address the Government's position and the Court should thus deny this motion, as well.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the defendants' pretrial motions without

a hearing.

Dated:  New York, New York
         February 11, 2022

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                            By:      __/s/_____
                                        Jason A. Richman
                                        Benjamin Woodside Schrier
                                        Kyle A. Wirshba
                                        Assistant United States Attorneys


Cc:     Defense Counsel
         (Via ECF)


25